# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PERFECTLY FRESH FARMS, INC.;
PERFECTLY FRESH CONSOLIDATION,
INC.; PERFECTLY FRESH SPECIALTIES,
INC.; JEFFREY LON DUNCAN,
                    *Petitioners,*

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,

                    *Respondent.*

No. 09-72434

THOMAS BENNETT,
                    *Petitioner,*

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE,

                    *Respondent.*

No. 09-72535

AGRI Nos.
PACA D-05-001-3
PACA-APP 05-
0010-15

OPINION

On Petitions for Review of an
Order of the Judicial Officer of the
United States Department of Agriculture

Argued and Submitted
May 3, 2011—Pasadena, California

Filed August 28, 2012

Before: Harry Pregerson, Raymond C. Fisher, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

9945

## COUNSEL

Jonathan Barry Sexton (argued) and Stephen T. Kitagawa, Paul R. Roper, P.C., Orange, California, for petitioner Thomas Bennett.

Christopher F. Bryan (argued), Law Office of Christopher F. Bryan, Los Angeles, California, for petitioners Perfectly Fresh Consolidation, Inc., Perfectly Fresh Farms, Inc., Perfectly Specialties, Inc., and Jeffrey Lon Duncan.

James Michael Kelley, Marc. L. Kesselman, Leslie K. Lagomarcino (argued), and Brian J. Sonfield, Office of the General Counsel, U.S. Department of Agriculture, Washington, D.C., for respondent U.S. Department of Agriculture.

## OPINION

BERZON, Circuit Judge:

In 2001, two entrepreneurs founded Perfectly Fresh Marketing, Inc., a wholesale produce company, and soon thereafter founded three subsidiary companies to handle different aspects of the business. Although things started out well, before long the firms found themselves in financial straits, and declared bankruptcy before the legal proceedings that are the subject of this appeal began.

Those proceedings involve a complex, rarely litigated federal statute, the Perishable Agricultural Commodities Act ("PACA" or "the Act"), 7 U.S.C. § 499a *et seq.*, designed in part to assure that farmers are paid for their produce. In 2009, the Judicial Officer ("JO") of the U.S. Department of Agriculture determined that Perfectly Fresh Farms, Inc., Perfectly Fresh Consolidation, Inc., and Perfectly Fresh Specialties, Inc. had violated the PACA by failing to make prompt payment for produce purchases. *See id.* § 499b(4); *see generally In re Perfectly Fresh Farms, Inc.*, 68 Agric. Dec. 507 (U.S.D.A. 2009) ("JO Order"). All three of these entities—like their parent company Perfectly Fresh Marketing, Inc.[1]—had failed by the time the Department of Agriculture commenced administrative proceedings against them, each having filed for bankruptcy in February, 2003 and ceased doing business thereafter.

The penalty assessed against the three entities—publication of the facts and circumstances of their violations—caused them no harm, given that they were no longer in business. But the JO also determined that the two individual petitioners in this case were "responsibly connected" to the Subsidiaries. *See* 7 U.S.C. § 499a(b)(9). The Subsidiaries have conceded that it is primarily for these individuals' benefit that they have petitioned for review. The JO found that Jeffrey Lon Duncan was responsibly connected with Consolidation, of which he was the president, a director, and a ten percent owner, and that Thomas Bennett was responsibly connected with Farms, of which he was president, a director, and a ten percent owner. As "responsibly connected" individuals, Duncan and Bennett are subject to employment and licensing bans of variable duration in the perishable agricultural commodities industry. *See id.* §§ 499d(b) & 499h(b). They, and the Subsidiaries, petitioned for review of the JO's order.

---

[1]We will refer to each company by the distinguishing word in its name (e.g., "Consolidation" or "Farms") and to the three subsidiaries collectively as the "Subsidiaries."

# I

## A.

The Perishable Agricultural Commodities Act "was enacted . . . in 1930, and has undergone numerous amendments since that time. The Act was aimed at preventing unfair business practices and promoting financial responsibility in the fresh fruit and produce industry." *Farley & Calfee, Inc. v. U.S. Dep't of Agric.*, 941 F.2d 964, 966 (9th Cir. 1991). Central here is the PACA provision making it unlawful for "any commission merchant, dealer, or broker . . . to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any [perishable agricultural] commodity to the person with whom such transaction is had." 7 U.S.C. § 499b(4). The regulations specify that "prompt[ ]" payment for "produce purchased by a buyer" is payment "within 10 days after the day on which the produce is accepted." 7 C.F.R. § 46.2(aa)(5); *see also id.* § 46.2(aa)(11) (allowing parties to opt out of the ten-day default rule).

The Secretary of Agriculture (the "Secretary") may, upon notification of an alleged violation, commence administrative proceedings against any commission merchant, dealer, or broker. 7 U.S.C. § 499f(c)(2). At the conclusion of such proceedings, the Secretary may issue a "reparation order" requiring the respondent to pay the "person complaining" "the amount of damage . . . to which such person is entitled as a result of [the] violation." *Id.* § 499g(a). The Secretary may also "publish the facts and circumstances of such violation and/or, by order, suspend the license of [the] offender for a period not to exceed ninety days, except that, if the violation is flagrant or repeated, the Secretary may, by order, revoke the license of the offender." *Id.* § 499h(a).[2]

---

[2]As we explain later, the Secretary has delegated these responsibilities to the JO. *See infra* note 5.

Additionally, the Act requires all persons who "carry on the business of a commission merchant, dealer, or broker" to have a valid and effective license. *Id*. § 499c(a). There are statutory bans, usually of a year or two, on the employment and licensing of, and possible surety bond requirements for, "any person, or any person who is or has been responsibly connected with any person . . . (1) whose license has been revoked or is currently suspended by order of the Secretary; [or] (2) has been found . . . to have committed any flagrant or repeated violation" of the Act.[3] *Id*. § 499h(b); *see id*. § 499d(b); *see also id*. § 499d(c).

The Act defines "responsibly connected" as "affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association." *Id*. § 499a(b)(9). Congress amended the Act in 1995, making the foregoing definition of "responsibly connected" rebuttable:

> A person shall not be deemed to be responsibly connected if the person demonstrates by a preponderance of the evidence [(1)] that the person was not actively involved in the activities resulting in a violation of this chapter *and* [(2)] that the person either was only nominally a partner, officer, director, or shareholder of a violating licensee or entity subject to license or was not an owner of a violating licensee or entity subject to license which was the alter ego of its owners.

*Id*. (emphasis added); *see* Perishable Agricultural Commodities Act Amendments of 1995, Pub. L. No. 104-48, § 12(a), 109 Stat. 424. The broad definition of "responsibly connect-

---

[3]Under the PACA, "[t]he terms 'employ' or 'employment' mean any affiliation of any person with the business operations of a licensee." 7 U.S.C. 499a(b)(10).

ed," and the difficulty of rebutting the presumption of responsible connection, accord with the House Committee on Agriculture's observation that the PACA is "admittedly and intentionally a 'tough' law," S. Rep. No. 84-2507, at 3 (1956), *reprinted in* 1956 U.S.C.C.A.N. 3699, 3701 (quoting H. Rep. No. 84-1196, at 2 (1955)), an observation with which the federal courts of appeals have generally agreed. *See Baiardi Food Chain v. United States*, 482 F.3d 238, 241 (3d Cir. 2007); *Golman-Hayden Co. v. Fresh Source Produce Inc.*, 217 F.3d 348, 351 (5th Cir. 2000); *Martino v. U.S. Dep't of Agric.*, 801 F.2d 1410, 1411 (D.C. Cir. 1986).

B.

The facts underlying these petitions for review are as follows:

Gary Tice was an experienced professional in the produce industry. He sought out Jeffrey Lon Duncan to start a produce firm with him. Duncan had also worked in the produce industry for some time and had developed an expertise in selling produce to cruise lines, "a very exacting business given that ships are in port for a very short time and are more demanding than other customers." JO Order at 520. Tice was more knowledgeable than Duncan about the ins and outs of running a business, having spent the last few years advising other companies on strategy and operations. Together Tice and Duncan founded Perfectly Fresh Marketing, Inc. ("Marketing") in June, 2001. At the outset, Tice and his wife owned fifty-one percent of Marketing and Duncan the remainder.

Later, after a new business partner made a substantial investment in Perfectly Fresh, three subsidiaries were formed: Specialties, Farms, and Consolidation. Specialties was to sell produce to supermarkets; Consolidation was to focus on selling to cruise lines; and Farms was to develop "grower relationships, such as an exclusive agreement to distribute

papayas grown by Hawaiian Pride." JO Order at 516. Marketing owned ninety percent of each of the Subsidiaries. According to the paperwork filed with the Department of Agriculture, Duncan owned the remaining ten percent of Consolidation; Thomas Bennett—a forty-year veteran of the produce industry whom Tice had brought aboard—owned the same percentage of Farms.[4]

The same papers listed Duncan as president and a director of Consolidation and Bennett as president and a director of Farms. In spite of their titles, neither Duncan nor Bennett was much involved in the legal or financial affairs of their companies. Both testified to having signed the corporate paperwork fairly casually. Indeed, according to Bennett, the "title of president was [given to him] just to allow him to deal with a higher level of personnel at the companies to which he would be selling," JO Order at 521; he did not believe himself to have authority even to sign checks on behalf of Farms.

The precise relationship between Marketing and its newly formed subsidiaries is the main issue in this case. This much, taken from the JO's order, appears clear:

> The four companies were to be run as one entity, with Perfectly Fresh Marketing, Inc., essentially managing the overall operations, and Consolidation, Farms, and Specialties handling sales, each in its own sphere of specialization. . . . Mr. Tice, Mr. Bennett, and Mr. Duncan all considered that the three new companies were sales entities, with Perfectly Fresh Marketing, Inc., handling all the operations including the purchasing; Perfectly Fresh Marketing, Inc., would buy all the produce and transfer it to the appropriate company; Perfectly Fresh Marketing, Inc., leased all the warehouse space; and Perfectly

---

[4]The record does not indicate the ownership of the remainder of Specialties.

> Fresh Marketing, Inc., handled the receiving when produce arrived at the warehouse. None of the entities ever held a board meeting.

> It appears that customers knew of the companies as "Perfectly Fresh" and were not aware that in reality four different companies existed. . . . Generally, checks from customers went first into the [Subsidiaries'] bank accounts, but were then transferred into Perfectly Fresh Marketing, Inc.'s account to keep the other accounts at a virtual zero balance. According to Mr. Tice, all the purchasing was done by Perfectly Fresh Marketing, Inc., even though the accounts payable documents . . . admitted into evidence generally linked each purchase to a specific company and even though the produce payables listed in the schedules filed with the bankruptcy court generally matched those accounts payable documents, in terms of which company purchased which lot of produce.

JO Order at 516-17.

Approximately five months after the Subsidiaries had been formed, Perfectly Fresh ran into financial difficulties. The companies managed to keep their accounts current through the end of November, but in December, Perfectly Fresh ceased paying its suppliers in a timely manner. The financial problems worsened, and, on February 3, 2003, Marketing and the Subsidiaries filed for bankruptcy. In October, 2004, the Department of Agriculture commenced disciplinary proceedings against the three Subsidiaries—but not Marketing—for violating the PACA's requirement that produce dealers, brokers, and commission merchants pay for produce in full and promptly. *See* 7 U.S.C. § 499b(4).

Bennett had learned about Perfectly Fresh's financial difficulties in December; in early January, concerned about his reputation in the industry, he decided to resign. Duncan

became aware of the financial troubles around the same time, but Consolidation, the Subsidiary with which he was primarily involved, remained profitable throughout. The Department of Agriculture determined that both Duncan and Bennett were "responsibly connected" individuals within the meaning of the Act, Bennett with regard to Farms, and Duncan with regard to both Consolidation and Specialties. Faced with penalties affecting their future participation in the industry, Bennett and Duncan contested the "responsibly connected" determinations at a hearing before the agency's Chief Administrative Law Judge ("ALJ"), without success. In the same proceedings, the Chief ALJ adjudged each of the Subsidiaries to have violated the Act's full-payment-promptly provision. *See id.* On appeal, the JO determined that Duncan was not responsibly connected to Specialties, but otherwise affirmed. We now deny the petitions for review and affirm.

## II

We have jurisdiction to hear petitions for review of final PACA orders. 28 U.S.C. § 2342(2). The JO's decision constitutes a final order ripe for our review. "[T]he scope of our review of administrative decisions is narrow: administrative agency decisions will be upheld unless 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law . . . .' " *Farley & Calfee, Inc.*, 941 F.2d at 966 (quoting 5 U.S.C. § 706(2)(A)). We will affirm the JO's factual findings if they are supported by substantial evidence. *See Potato Sales Co. v. Dep't of Agric.*, 92 F.3d 800, 803 (9th Cir. 1996). We review his conclusions of law de novo, *id.*, but with the appropriate level of deference to his interpretations of the statute his agency administers.

As to what that appropriate level is, two other courts of appeals have concluded that the JO's interpretations of the PACA in disciplinary proceedings are entitled to deference under *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Coosemans Special-*

*ties, Inc. v. Dep't of Agric.*, 482 F.3d 560, 564 (D.C. Cir. 2007); *G & T Terminal Packaging Co. v. U.S. Dep't of Agric.*, 468 F.3d 86, 95-96 (2d Cir. 2006). We join them.

"[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears [(1)] that Congress delegated authority to the agency generally to make rules carrying the force of law, and [(2)] that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). With respect to the first requirement, Congress has provided for PACA violations to be adjudicated "[a]fter opportunity for hearing," 7 U.S.C. § 499f(d), and directed that "the Secretary shall determine whether or not . . . [the respondent] violated" the Act, language that implies a delegation of interpretative authority. *Id.* Congress has also vested the courts of appeals with jurisdiction to review the outcomes of these adjudications, 28 U.S.C. § 2342(2), another indication that Congress intended to create a "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie" pronouncements entitled to *Chevron* deference. *Mead*, 533 U.S. at 230.

As to the second requirement for application of *Chevron* deference, the JO's decision was "promulgated in the exercise" of the authority Congress delegated to the agency to make rulings carrying the force of law, *Mead*, 533 U.S. at 227:[5]

---

[5]That the Judicial Officer and not the Secretary himself decides PACA unfair conduct cases does not render *Chevron* deference inappropriate. *Cf. INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (holding that case-by-case adjudications of the BIA are entitled to *Chevron* deference, even though Congress conferred adjudicatory authority on the Attorney General). The Secretary of Agriculture has delegated the Judicial Officer authority to act "as final deciding officer" in formal adjudications, 7 C.F.R. § 2.35(a)(1), pursuant to Congressional authorization to delegate "the *whole* or any part of any regulatory function which the Secretary is, now or after April 4, 1940, required or authorized to perform," 7 U.S.C. § 450d (emphasis added). Congress emphasized that "[w]henever a dele-

The decision was announced, after a formal hearing, by the Judicial Officer in an opinion published in Agriculture Decisions, the agency's official reporter, *see In re Perfectly Fresh Farms, Inc.*, 68 Agric. Dec. 507 (U.S.D.A. 2009); agency practice accords precedential significance to such opinions, *In re PMD Produce Brokerage Corp.*, 59 Agric. Dec. 351, 362 (U.S.D.A. 2000), a practice we have characterized "as *the* essential factor in determining whether *Chevron* deference is appropriate." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009) (en banc) (quoting *Alvarado v. Gonzales*, 449 F.3d 915, 922 (9th Cir. 2006)) (internal quotation marks omitted). For all these reasons, we conclude that *Chevron* deference is accorded to statutory interpretations contained in JO opinions applying the PACA.

## III

As to the merits, the Subsidiaries first argue that the JO erred in determining that they failed to "make full payment promptly in respect of . . . transaction[s] in" perishable agricultural commodities. 7 U.S.C. § 499b(4). Because the JO's determination that the Subsidiaries purchased produce is supported by substantial evidence, we deny the petition.

The JO's conclusion that the Subsidiaries failed to make full payment promptly was based on three independent rationales. First, the JO found that the record evidence, particularly the Subsidiaries' business records, indicated that they, and not Marketing, purchased produce from the suppliers. JO Order at 523-24. Second, the JO interpreted the Subsidiaries' bank-

---

gation is made . . . all provisions of law shall be construed as if the regulatory function . . . had (to the extent of the delegation) been vested by law in the individual to whom the delegation is made." *Id.* § 450e; *see also id.* § 450c (defining the term "regulatory function" as including "determining whether" orders, licenses, sanctions and other regulatory actions are "authorized or required by law"); *id.* § 6912(a) (also authorizing delegations of "any . . . function vested in the Secretary as of October 13, 1994").

ruptcy filings as affirmative admissions that they were responsible for payments to suppliers, and even suggested that the Subsidiaries should be estopped from arguing otherwise. *Id.* at 524-27. Third, the JO concluded that Marketing served as the Subsidiaries' agent, and as such, liability for Marketing's failure to pay suppliers should "flow through" to the Subsidiaries. *Id.* at 536.

The Subsidiaries contest all of these determinations, arguing that: (1) the JO's factual determination that the Subsidiaries purchased produce is not supported by substantial evidence; (2) the bankruptcy filings do not necessarily constitute an express admission; and (3) the JO's "flow through" conception of liability under § 499b(4) is legally erroneous. Because we hold that the JO's factual determinations are supported by substantial evidence, we need not address the Subsidiaries' challenges to the JO's other rationales.

The JO's determination that the Subsidiaries purchased produce from suppliers is supported by substantial evidence in the record. In particular, Perfectly Fresh's business records, a letter written by Tice to the agency investigator, testimony from Perfectly Fresh employees, and the bankruptcy filings of the Subsidiaries all support the conclusion that the Subsidiaries failed to make payment promptly for produce they purchased from suppliers.

The Subsidiaries' disagreement with the JO's factual findings centers on the role of Marketing in the purchasing of produce. According to the Subsidiaries, Marketing did all the purchasing of produce, which the Subsidiaries then sold. Some of the record testimony supports this view. Duncan, for instance, testified that he would put orders from Consolidation's customers into Perfectly Fresh's internal system, and then buyers from Marketing would purchase produce from suppliers to fill those orders. In other words, according to Duncan, "[b]uying was done by Perfectly Fresh Marketing."

**[1]** Other testimony, however, supports the JO's conclusion that the Subsidiaries were buying produce. Bennett testified that "[Farms'] sales team, salesmen, would actually buy product that they were selling," even though "all of the invoices and everything were being paid by Perfectly Fresh Marketing." And when Duncan explained the purchasing system in more detail, it became clear that he arranged entire transactions as a unit, placing orders for produce to be purchased only after receiving orders from his customers, and calling suppliers to check availability and prices. Duncan provided an illustration of this process: First, he would receive orders from customers indicating a need for, say, leeks. Knowing his customer needed a certain quantity of leeks, Duncan would call suppliers and check their price on leeks, then call the customer back to close the deal. Duncan would then put the order into a computer system, where a Marketing employee would fill out the purchase order, on terms already ironed out by Duncan, his supplier, and his customer. Both Bennett and Duncan also received complaints from produce sellers when they were not paid on time, suggesting that at least some suppliers believed that they were owed payments by the Subsidiaries rather than Marketing. The system, then, was one in which buying and selling were not purely separate transactions, as at a grocery store, say. While Marketing employees may have been left to fill out purchase orders, they did so at the direction of the Subsidiaries, in order to acquire particular lots of produce already destined for particular customers.

**[2]** This interpretation is strongly supported by the companies' business records. The record contains numerous invoices submitted by suppliers for purchase orders of produce. Most of these invoices are addressed to Marketing, but some are addressed to "Perfectly Fresh," and some are directed to a particular Subsidiary. Each of these invoices is paired in the business records with a voucher assigning the particular order to one of the Subsidiaries. Each Subsidiary in turn maintained accounts payable files showing debts owed to particular sup-

pliers of produce, rather than to Marketing. There was also testimony that the Subsidiaries' checks were used to pay produce suppliers.

Tice insisted that these records did not show that the Subsidiaries bought produce, arguing that a voucher was "the same thing as an invoice, if you will, from [M]arketing to [C]onsolidation, or an invoice from [M]arketing to [S]pecialities," and that Marketing did all the buying. The JO found this testimony not credible in light of a letter Tice had written to the agency investigator in which he said that Marketing "turned over all its previous business to the three [subsidiaries] and did no actual buying and selling." The JO's credibility determination is entitled to deference, and we see no basis to disturb it.

The JO also cited the Subsidiaries' bankruptcy filings as indicating that they failed to make payment promptly to their suppliers. The "Schedule F" that each of the Subsidiaries filed with the bankruptcy court lists the creditors holding unsecured claims against them and the amount of those claims. The Subsidiaries' Schedule Fs listed as creditors the same produce suppliers that were listed in the disciplinary complaints. The JO determined that the Schedule Fs therefore constituted evidence that the Subsidiaries had violated the Act's full-payment-promptly provision, § 499b(4), as they were effectively "admissions that these debts for produce did exist at the time of the filings." JO Order at 525.

The Subsidiaries argue that the bankruptcy filings should not be interpreted as admissions that they, and not Marketing, had unpaid debts to produce suppliers. The Schedule Fs, the Subsidiaries note, contained the following disclaimer:

> CREDITORS LISTED ON THE ATTACHED SHEETS WITH AN ASTERISK (*) ARE CREDITORS WHO MAY HAVE STATUTORY TRUST INTERESTS IN THE RECEIPTS GENERATED

BY THE OPERATION OF THE DEBTOR'S BUSI-
NESS PURSUANT TO THE PERISHABLE AGRI-
CULTURAL COMMODITIES ACT . . . .

The Subsidiaries argue, based on this disclaimer, that they
only listed debts to produce suppliers on their Schedule Fs
because they believed that the proceeds from the sale of such
produce might still be encumbered by a PACA trust, even if
the produce itself was only directly purchased by Marketing.[6]
While there appears to be no precedent for PACA trust liabil-
ity "following" produce in this manner, the Subsidiaries argue
that there may not be complete overlap between PACA trust
liability and "full payment promptly" liability under
§ 499b(4), and that their decision to list debts to produce sup-
pliers on their Schedule Fs for purposes of PACA trust liabil-
ity does not necessarily constitute an admission with regards
to full payment promptly liability.

[3] Without getting into the complex statutory question of
whether this argument has any merit, we note that even if it
were true, it serves only to defeat the assertion that the Sched-
ule Fs constitute affirmative admissions of full payment
promptly liability that would now estop the Subsidiaries from
suggesting that they had no debts to produce suppliers at all.
Even if the Schedule Fs do not necessarily, for purposes of
estoppel, constitute admissions, the JO was still entitled to
interpret them as evidence that the Subsidiaries did purchase
produce from suppliers. This interpretation is, after all, con-
sistent with the rest of the evidence, particularly the invoices

---

[6]"PACA trust" is a trust created by the statute to protect the claims of
produce sellers, *see* 7 U.S.C. § 499e(c), that "elevate[s] the claims of
unpaid perishable agricultural commodities suppliers over all other credi-
tors of the bankrupt estate." *Middle Mountain Land & Produce, Inc. v.
Sound Commodities, Inc.*, 307 F.3d 1220, 1224 (9th Cir. 2002). The
PACA "requires licensed dealers to hold all perishable commodities pur-
chased on short-term credit, as well as sales proceeds, in trust for the bene-
fit of unpaid sellers." *Am. Banana Co. v. Republic Nat'l Bank of N.Y.,
N.A.*, 362 F.3d 33, 37 (2d Cir. 2004).

and vouchers, which closely matched the debts to produce suppliers listed on the Schedule Fs. Furthermore, Marketing itself listed "virtually no produce creditors on its Schedule F," casting significant doubt on the Subsidiaries' claims that Marketing was responsible for purchasing produce and that the Schedule Fs were intended to reflect PACA trust liability. If the Subsidiaries' Schedule Fs were reflecting derivative PACA trust liability, then the Marketing Schedule Fs, prepared by the same individuals, should have listed the same obligations, as Marketing would have had primary PACA trust liability were it the entity that had purchased the produce. Moreover, when asked about the Schedule F listings at the hearing, Tice never mentioned PACA trust liability, explaining instead that the Subsidiaries listed debts to produce suppliers as "a way to be able to put the asset to the debt." The Schedule Fs therefore reinforce the JO's conclusion that the Subsidiaries purchased produce and failed to pay for it promptly.

**[4]** There is therefore substantial evidence to support the JO's finding that the Subsidiaries purchased produce. The hearing testimony, business records, and bankruptcy filings all reinforce this conclusion, and while the record as a whole may be susceptible to different interpretations, we cannot say that the evidence marshaled by the JO was not adequate to support his conclusions.

## IV

**[5]** The Subsidiaries next argue that the JO erred in determining that their violations were "willful" and "repeated." JO Order at 527. PACA imposes licensing and employment restrictions on individuals found to have committed "any flagrant or repeated violation of section 499b." 7 U.S.C. §§ 499d(b), 499h(b)(2).[7] Where the violations are " 'willful,'

---

[7]Because "[t]he Act prescribes consequences for violations that are 'flagrant *or* repeated . . . [o]ur . . . finding that the violations were repeated

license revocation proceedings may be initiated without a prior written warning and opportunity to demonstrate or achieve compliance." *Potato Sales*, 92 F.3d at 804 (citing 5 U.S.C. § 588(c); 7 C.F.R. § 46.45(e)(5)). Violations that "did not occur simultaneously . . . must be regarded as 'repeated' violations." *Reese Sales Co. v. Hardin*, 458 F.2d 183, 187 (9th Cir. 1972). For example, fifty-one transactions has been held to fall "plainly within the permissible definition of 'repeated.' " *Farley & Calfee*, 941 F.2d at 968. The JO was thus correct in determining that the violations committed by the Subsidiaries were "repeated" in light of the number of violations (286 for Consolidation, 142 for Farms, and 796 for Specialties) and the amount unpaid (over $373,000 for Consolidation, over $442,000 for Farms, and over $263,000 for Specialties). JO Order at 528.

[6] PACA violations are " 'willful' if the violator: '(1) intentionally does an act which is prohibited, irrespective of evil motive or reliance on erroneous advice, or (2) acts with careless disregard of statutory requirements.' " *Potato Sales*, 92 F.3d at 805 (quoting *Lawrence v. Commodity Futures Trading Comm'n*, 759 F.2d 767, 773 (9th Cir. 1985)). The Subsidiaries argue that violations premised on the JO's "flow through" theory of liability cannot be willful because, under that theory, the Subsidiaries were held responsible for the acts of Marketing and committed no violations of their own. That argument may be correct, but it has no bearing on the JO's independent determination that the Subsidiaries themselves violated PACA's full payment promptly provision, and that those violations were willful. As the JO observed, there is ample evidence that the Subsidiaries' violations were intentional or committed with careless disregard of statutory requirements. Bennett and Duncan both admitted at the hear-

---

is sufficient," and we need not consider whether they were "flagrant." *Farley & Calfee*, 941 F.2d at 968 n.4; *cf. Potato Sales*, 92 F.3d at 805 (holding that the petitioner's violations were "flagrant" and thus declining to decide whether they were also "repeated").

ing that the Subsidiaries continued to place orders for produce despite knowing that their suppliers were not being paid promptly.

## V

There is also substantial evidence in the record to support the JO's conclusion that Duncan and Bennett were "responsibly connected" to the Subsidiaries.

PACA creates a presumption of responsible connection as to persons who are "affiliated or connected with a commission merchant, dealer, or broker as (A) partner in a partnership, or (B) officer, director, or holder of more than 10 per centum of the outstanding stock of a corporation or association." 7 U.S.C. § 499a(b)(9). That presumption can be rebutted if a person can show:

> by a preponderance of the evidence [(1)] that the person was not actively involved in the activities resulting in a violation of this chapter *and* [(2)] that the person [ ] was only nominally a partner, officer, director, or shareholder of a violating licensee or entity subject to license.

*Id.* (emphasis added). There is no dispute that Duncan and Bennett are subject to PACA's presumption of responsible connection; they argue only that they have carried their burden of rebutting it.

[7] The JO articulated in *In re Michael Norinsberg*, 58 Agric. Dec. 604 (U.S.D.A. 1999), the standard for determining when a person is "actively involved in the activities resulting in a violation." "The standard," the JO explained, "is as follows:"

> A petitioner who participates in activities resulting in a violation of the PACA is actively involved in those

activities, unless the petitioner demonstrates by a preponderance of the evidence that his or her participation was limited to the performance of ministerial functions only. Thus, if a petitioner demonstrates by a preponderance of the evidence that he or she did not exercise judgment, discretion, or control with respect to the activities that resulted in a violation of the PACA, the petitioner would not be found to have been actively involved in the activities that resulted in a violation of the PACA . . . .

*Id.* at 610-11.[8] Neither Duncan nor Bennett takes issue with Norinsberg's articulation of what it means to be "actively involved." The term is certainly ambiguous, and we cannot say that the JO's interpretation in *Norinsberg* is "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844. We therefore accept and apply it.

This court has in one case, *Maldonado v. Department of Agriculture*, 154 F.3d 1086 (9th Cir. 1998), addressed the issue of "active[ ] involve[ment]" under § 499a(b)(9). *Maldonado* overturned the JO's determination that the petitioner was actively involved in an activity resulting in failure to pay promptly. We found no active involvement even though the petitioner "r[a]n[ ] the produce department" of the company that had failed to pay for produce promptly, stressing that the relevant company had defaulted in large part because new owners "looted" it through various fraudulent activities of which Maldonado was not aware. *Id.* at 1086, 1088.

*Maldonado* predated *Norinsberg*, and did not set forth general criteria for what it means to be "actively involved in the

---

[8]The JO defined this standard after the D.C. Circuit had granted a petition for review of a "responsibly connected" determination on the ground that the JO had "inadequately articulated the factors relevant in interpreting 'actively involved.' " *Norinsberg v. U.S. Dep't of Agric.*, 162 F.3d 1194, 1196 (D.C. Cir. 1998).

activities resulting in a violation" (largely because the JO had himself yet to develop a standard). The JO explicitly referenced *Maldonado* in announcing the new standard in *Norinsberg*, explaining that he believed the standard was "consistent with [his] reading of *Maldonado*." *Norinsberg*, 58 Agric. Dec. at 612.

In any event, "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). Thus, *Maldonado* only remains good law to the extent it is consistent with *Norinsberg*. Applying *Norinsberg*, the JO noted that "the buying and selling of produce at a time when produce sellers are not getting paid pursuant to the requirements of PACA . . . constitute[s] [active] involvement." JO Order at 531 (citing *In re Janet S. Orloff*, 62 Agric. Dec. 281, 290-92 (U.S.D.A. 2003)).

There is ample evidence in the record to support the JO's determination that Duncan was actively involved in the violations committed by Consolidation. In disputing this determination, Duncan again argues that Consolidation did not purchase produce, and that he himself was merely a "salesman." As we have already held, there is substantial evidence to support the JO's conclusion that Consolidation purchased produce from suppliers.

**[8]** Moreover, Duncan's personal role in Consolidation was not "limited to the performance of ministerial functions only." *Norinsberg*, 58 Agric. Dec. at 611. Duncan had personal relationships with the suppliers to whom he turned when he received an order from his customers, and those suppliers looked to Duncan when they were not getting paid. As discussed earlier, Duncan called suppliers in response to orders placed by his customers, and negotiated the terms of

orders that would allow produce to flow from suppliers to Consolidation to customers. Duncan would then put the order into a computer system, where a Marketing employee would fill out the purchase order, on terms already ironed out by Duncan, his supplier, and his customer. This testimony shows that the "buyers" who worked for Marketing were the ones performing "ministerial" tasks, and that Duncan was engaged in activity involving "judgment, discretion, or control." *Id.*

*Orloff*, on which Duncan relies, does not help him. In that case, an individual who purchased produce but was not involved in payment decisions argued that she was therefore not actively involved in the activities resulting in a violation of the PACA. *Orloff*, 62 Agric. Dec. at 290. The JO rejected this argument, observing that the Petitioner's actions were not ministerial because she "decided whether to make purchases of frozen foods . . . and chose to do so even though she knew or should have known that [the company] was not paying produce suppliers . . . in accordance with the PACA." *Id.* at 291-92. Duncan's argument that he was not actively involved in PACA violations because he was not responsible for sending the payments directly to suppliers and because Consolidation itself was profitable is therefore foreclosed. Like the petitioner in *Orloff*, Duncan continued to purchase produce despite knowing that Perfectly Fresh was unable to pay its suppliers in a timely fashion.

**[9]** Substantial evidence also supports the JO's determination that Bennett was actively involved in the PACA violations of Farms. Like Duncan, Bennett was in charge of his subset of the overall business of Perfectly Fresh, and he exercised "judgment, discretion, or control" with respect to that business. *Norinsberg*, 58 Agric. Dec. at 611. In particular, Bennett supervised a cadre of employees and undertook a significant outside storage business on his own initiative. Unlike Duncan, however, Bennett "instructed the salesmen not to buy product until we got some of the receivables in" after learning that Perfectly Fresh was having trouble paying its bills, and

he resigned less than a month later. Bennett's efforts to avoid committing PACA violations are admirable, but, unfortunately, no less than 21 violations occurred while he was still in charge of Farms, and he cites no authority for the suggestion that his later resignation absolves him of responsibility for those violations.

**[10]** The conclusion that Duncan and Bennett were actively involved in the activities resulting in the violation precludes them from rebutting the presumption that they were "responsibly connected" to the Subsidiaries. We therefore need not consider whether they have carried their burden under the second prong.[9]

## CONCLUSION

The JO's determination that the Subsidiaries purchased produce and failed to make prompt payment for it as required by § 499b(4) is supported by substantial evidence. The JO's further conclusion that Duncan and Bennett were responsibly connected to Consolidation and Farms under § 499a(b)(9) is therefore also supported by substantial evidence, and free of legal error.

---

[9]We note, however, that we are troubled by the JO's insistence that a shareholder is automatically an "owner" for purposes of the "alter ego" defense (which allows rebuttal of the presumption of responsible connection under the second prong if a person demonstrates that he "was not an owner of a violating licensee or entity subject to license which was the alter ego of its owners," 7 U.S.C. § 499a(b)(9)), even when he demonstrates that the violating licensee is the alter ego of a *different* owner. *See* JO Order at 539 n.15; *In re Anthony L. Thomas*, 59 Agric. Dec. 367, 386-88 (U.S.D.A. 2000); *In re Michael Norinsberg*, 56 Agric. Dec. 1840, 1864-65 (U.S.D.A. 1997), *rev'd on other grounds*, 162 F.3d 1194 (D.C. Cir. 1998), *final decision on remand*, 58 Agric. Dec. 604, 609 n.4 (1999). The JO has not, in our view, adequately explained the basis for such a blanket rule. In particular, his explanation does not take account of the use of the plural "owners" with regard to the alter ego factor, or of the use elsewhere in the statute of the term "shareholder" as well as "owner." *See Anthony Thomas*, 59 Agric. Dec. at 388; 7 U.S.C. § 499a(b)(9).

For the foregoing reasons, the petitions for review are REJECTED.