**Bodie S. KNAPP, doing business as The Wild Side, Petitioner**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 14–60002.

United States Court of Appeals, Fifth Circuit.

July 31, 2015.

448

the bank.

Phillip Westergren, Corpus Christi, TX.

Charles Edward Spicknall, Colleen A. Carroll, Eric H. Holder, Jr., William G. Jenson, James Michael Kelly, Leslie Karen Lagomarcino, Esq., Senior Counsel, Loretta Lynch, Margaret Reinholt, U.S. Department of Agriculture, Washington, DC.

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

The United States Secretary of Agriculture ("Secretary") fined Bodie Knapp $395,900 after finding that he bought and sold regulated animals without a license, in violation of the Animal Welfare Act ("AWA") and implementing regulations. In his petition for review, Knapp argues that his activities were lawful, and that the Secretary abused its discretion in its choice of sanction. We GRANT in part and DENY in part the petition for review.

## FACTS AND PROCEEDINGS

Bodie Knapp formerly operated a business in Mathis, Texas, that exhibited wild and exotic animals to the public. See In re Knapp, 64 Agric. Dec. 756, 757 (U.S.D.A. Jan. 4, 2005). Knapp possessed a license to exhibit these animals under the Animal Welfare Act. Id. In 2004, the Administrator of the Animal and Plant Health Inspection Service ("Administrator"), an agency within the U.S. Department of Agriculture ("Department"), filed two complaints against Knapp alleging that he had mishandled animals, failed to provide them with adequate veterinary care, and failed to keep required records relating to, but not limited to, the deaths of two tigers and two lions. In re Coastal Bend Zoological

Ass'n, 65 Agric. Dec. 993, 994 (U.S.D.A. 2006); In re Knapp, 64 Agric. Dec. at 757. In January 2005, after Knapp failed to timely respond to the allegations in one of the complaints, the Administrative Law Judge ("ALJ") entered a default decision revoking Knapp's license and ordering him to cease and desist from future violations of the AWA or the "[r]egulations and [s]tandards." In re Knapp, 64 Agric. Dec. at 773. The decision was affirmed by the Judicial Officer, who has final authority to issue decisions on behalf of the Secretary in formal adjudicatory proceedings. See 7 C.F.R. § 2.35(a); In re Knapp, AWA Docket No. 04–0029, 2005 WL 1283510, at *29 (U.S.D.A. May 31, 2005). The revocation of Knapp's license became effective on September 10, 2005, after the denial of Knapp's motion for reconsideration. In re Knapp, AWA Docket No. 09–0175, 2013 WL 8213607, at *4 (U.S.D.A. June 3, 2013). In August 2006, pursuant to the second complaint, another ALJ assessed a $5,000 penalty against Knapp and ordered him to cease and desist from further violations of the AWA or the "[r]egulations and [s]tandards." In re Coastal Bend Zoological Ass'n, 65 Agric. Dec. at 1019.

In 2009, the Administrator initiated the instant action against Knapp, alleging that after losing his AWA license, he continued to buy, sell, and transport hundreds of animals in violation of the AWA and regulations. The complaint alleges that Knapp "offered for sale, delivered for transportation, transported, sold, or negotiated the purchase or sale" of 429 animals in thirty separate transactions between November 2005 and September 25, 2010.[1] The ALJ held a hearing, at which Knapp was represented by counsel and called three witnesses and introduced evidence. In re Knapp, AWA Docket No.

---

1. Although the Administrator states in the complaint that the number of animals at issue is 419, the animals listed in the complaint total 429.

09–0175, 2011 WL 4946791, at *1. The ALJ determined that eight of the thirty transactions violated the AWA and regulations, and he assessed Knapp a $15,000 penalty and ordered him to cease and desist from further violations. *Id.* at *8, 11. The ALJ found that the Administrator "was not substantially justified" in challenging Knapp's other transactions, and that Knapp was therefore entitled to attorney's fees and expenses based on those allegations under the Equal Access to Justice Act. *Id.* at *8 (citing 5 U.S.C. § 504). The parties cross-appealed to the Judicial Officer.

The Judicial Officer found that Knapp violated the Animal Welfare Act, Department regulations, and the terms of his prior cease and desist orders by operating as an animal dealer without a license with respect to many of the animals listed in the complaint. *In re Knapp*, AWA Docket No. 09–175, 2013 WL 8213607, at *15–18. The Judicial Officer assessed Knapp a $42,800 penalty for buying or selling 214 animals without a license in violation of the AWA, 7 U.S.C. § 2134, and two regulatory provisions, 9 C.F.R. §§ 2.1(a) and 2.10(c). *Id.* at *8, 10. The Judicial Officer imposed an additional $353,100 penalty on the ground that each of these transactions constituted a knowing violation of the two prior cease and desist orders. *Id.* at *10. The Judicial Officer also ordered Knapp to "cease and desist from violating the Animal Welfare Act and the Regulations and, in particular, [to] cease and desist from operating as a dealer without an Animal Welfare Act license." *Id.* at *19. Finally, the Judicial Officer found that the ALJ's determination regarding attorney's fees was premature. *Id.* at *12. On November 6, 2013, the Judicial Officer denied Knapp's amended petition for reconsideration. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8208439, at *13 (U.S.D.A. Nov. 6, 2013). Knapp filed a timely petition for review in this court on January 2, 2014. *See* 7 U.S.C. § 2149(c) (allowing 60 days after a final order to file a petition for review); 7 C.F.R. § 1.146(b).

## STANDARD OF REVIEW

We have jurisdiction to review the Judicial Officer's decision under 7 U.S.C. § 2149(c). We may overturn that decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Allred's Produce v. U.S. Dep't of Agric.*, 178 F.3d 743, 746 (5th Cir.1999). The arbitrary and capricious standard is "highly deferential." *Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l Hosp.*, 374 F.3d 362, 366 (5th Cir. 2004) (internal quotation marks and citation omitted). "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made, and '[i]t is well-established that an agency's action must be upheld if at all, on the basis articulated by the agency itself.'" *Id.* at 366–67 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42–43, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). However, "we may 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* at 367 (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

The Judicial Officer's factual findings must be upheld as long as they are supported by substantial evidence. 5 U.S.C. § 706(2)(E); *ZooCats, Inc. v. U.S. Dep't of Agric.*, 417 Fed.Appx. 378, 381 (5th Cir.2011) (per curiam); *Brock v. U.S. Dep't of Agric.*, 335 Fed.Appx. 436, 437 (5th Cir.2009) (per curiam). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Ellis v. Liberty Life Assurance Co. of Bos.*, 394 F.3d 262, 273 (5th Cir.2004) (internal quotation marks and citation omitted). In determining whether an administrative order is based on substantial evidence, we must consider "whatever in the record fairly detracts from [the] weight" of the evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Judicial Officer, in making factual findings, may substitute its judgment for that of the ALJ. *See* 5 U.S.C. § 557(b); *Robinson v. United States*, 718 F.2d 336, 338 (10th Cir.1983); *Mattes v. United States*, 721 F.2d 1125, 1129 (7th Cir.1983). However, "[i]n cases where the Secretary of an agency does not accept the findings of the ALJ, this court has an obligation to examine the evidence and findings of the [JO] more critically than it would if the [JO] and the ALJ were in agreement." *Young v. U.S. Dep't of Agric.*, 53 F.3d 728, 732 (5th Cir.1995) (second and third alterations in original) (internal quotation marks and citations omitted); *see also In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8208439, at *4 ("[T]he consistent practice of the Judicial Officer is to give great weight to the findings by, and particularly the credibility determinations of, administrative law judges ....").

■■■■ We review the Judicial Officer's legal conclusions de novo, but with the appropriate level of deference to his interpretations of the AWA and of Department regulations. *See Theodros v. Gonzales*, 490 F.3d 396, 400 (5th Cir.2007); *see also Perfectly Fresh Farms, Inc. v. U.S. Dep't of Agric.*, 692 F.3d 960, 966 (9th Cir.2012). We generally grant *Auer* deference to an agency's interpretation of its own ambiguous regulation, unless that interpretation is " 'plainly erroneous or inconsistent with the regulation,' " or "there is reason to suspect that the agency's interpretation 'does not reflect the agency's

fair and considered judgment on the matter in question.' " *Christopher v. SmithKline Beecham Corp.*, —— U.S. ——, 132 S.Ct. 2156, 2166, 183 L.Ed.2d 153 (2012) (quoting *Auer v. Robbins*, 519 U.S. 452, 461–62, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)); *see also Decker v. Nw. Envtl. Def. Ctr.*, —— U.S. ——, 133 S.Ct. 1326, 1337, 185 L.Ed.2d 447 (2013). Because the Judicial Officer acts on behalf of the Secretary in AWA hearings, his decisions qualify for *Auer* deference. 7 C.F.R. § 2.35(a); *see Excel Corp. v. U.S. Dep't of Agric.*, 397 F.3d 1285, 1296 (10th Cir.2005) (deferring to the Judicial Officer's interpretation of a Department regulation intended to implement another statute administered by the Department).

■■■■ To determine the appropriate level of deference to the Judicial Officer's interpretation of the AWA, we are guided by the two-step analysis set forth in *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). "[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears [ (1) ] that Congress delegated authority to the agency generally to make rules carrying the force of law, and [ (2) ] that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Id.* (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)); *see also Perfectly Fresh Farms, Inc.*, 692 F.3d at 966 (framing the question of whether *Chevron* applies as a two-step analysis). With respect to the first requirement, Congress has authorized the Secretary to "make such investigations or inspections as he deems necessary to determine whether any dealer [or] exhibitor ... has violated" the AWA. 7 U.S.C. § 2146(a). After notice and an opportunity for a hearing, the Secretary may revoke

licenses, assess civil penalties, and issue cease and desist orders against dealers or exhibitors who are found to have violated the AWA. *Id.* § 2149(a), (b). These provisions reflect Congress's intent to create a "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie" pronouncements entitled to *Chevron* deference. *Mead Corp.,* 533 U.S. at 230, 121 S.Ct. 2164. Indeed, the Supreme Court has recognized that "express congressional authorizations to engage in ... adjudication that produces ... rulings for which deference is claimed" is "a very good indicator of delegation meriting *Chevron* treatment." *Id.* at 229, 121 S.Ct. 2164 (citing cases).

With respect to the second requirement, the Judicial Officer promulgated its decision pursuant to formal procedures, as contemplated by Congress. Knapp received a hearing before the ALJ, at which his counsel presented evidence and cross-examined witnesses. *See* 7 C.F.R. §§ 1.131, 1.132 (providing that the ALJ's decision is to be "made in accordance with the provisions of 5 U.S.C. [§§ ] 556 and 557," which govern formal adjudication). The Judicial Officer, after reviewing the record of that hearing, issued a written opinion supported by reasoning. *In re Knapp,* AWA Docket No. 09–0175, 2013 WL 8213607. In addition, the agency treats decisions by the Judicial Officer as precedential. *See In re GH Dairy,* AWA Docket No. 10–0283, 70 Agric. Dec. 508, at *15 (U.S.D.A. Oct. 5, 2011) ("[P]ertinent decisions by the Judicial Officer, if affirmed or unappealed, do have precedential authority in this proceeding...."); *In re Billy Gray,* 52 Agric. Dec. 1044, 1993 WL 308542, at *14 (U.S.D.A. July 23, 1993) ("The precedents of the Judicial Officer are required to be followed.").

 In light of these considerations, we find that the Judicial Officer's decision

was "promulgated in the exercise" of the authority that Congress delegated to the agency to make rulings carrying the force of law. *See Mead,* 533 U.S. at 227, 121 S.Ct. 2164. The Judicial Officer's interpretations of the AWA therefore qualify for *Chevron* deference. *Accord 907 Whitehead Street, Inc. v. Sec'y of U.S. Dep't of Agric.,* 701 F.3d 1345, 1350 (11th Cir.2012) (holding that the Judicial Officer's interpretation of the AWA was entitled to *Chevron* deference); *cf. Perfectly Fresh Farms, Inc.,* 692 F.3d at 967 (granting *Chevron* deference to statutory interpretations contained in the Judicial Officer's opinions applying the Perishable Agricultural Commodities Act); *Coosemans Specialties, Inc. v. Dep't of Agric.,* 482 F.3d 560, 564–65 (D.C.Cir.2007) (same); *G & T Terminal Packaging Co. v. U.S. Dep't of Agric.,* 468 F.3d 86, 95–96 (2d Cir.2006) (same). Where, as here, an agency's decision qualifies for *Chevron* deference, we will accept the agency's reasonable construction of an ambiguous statute that the agency is charged with administering. *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005).

 Finally, we review the Judicial Officer's choice of sanction for abuse of discretion. *Am. Fruit Purveyors, Inc. v. United States,* 630 F.2d 370, 374 (5th Cir. 1980) (per curiam). The sanction may be overturned only if it is "unwarranted in law or without justification in fact." *Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 186, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973) (internal quotation marks and citations omitted).

## DISCUSSION

The Animal Welfare Act intends, in part, "to assure the humane treatment of animals during transportation in commerce," and "to insure that animals in-

tended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment." 7 U.S.C. § 2131(1)-(2). Among other provisions, the Act regulates "dealers" of animals. A "dealer" is defined, *inter alia*, as a "person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of . . . any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet." *Id.* § 2132(f).[2] Under the AWA, a dealer must possess a valid license to (1) "sell or offer to sell or transport or offer for transportation, in commerce, to any research facility or for exhibition or for use as a pet any animal," or (2) "buy, sell, offer to buy or sell, transport or offer for transportation, in commerce, to or from another dealer or exhibitor under this chapter any animals." *Id.* § 2134. Similarly, Department regulations provide, in relevant part, that any person operating as a dealer "must have a valid license," unless the person qualifies for one of eight exceptions. 9 C.F.R. § 2.1(a)(1), (3). The regulations further provide that "[a]ny person whose license has been suspended or revoked shall not buy, sell, transport, exhibit, or deliver for transportation, any animal during the period of suspension or revocation." *Id.* § 2.10(c). "Animal," in turn, is defined as including "any . . . warmblooded animal, which is being used, or is intended for use for research, teaching, testing, experimentation, or exhibition purposes, or as a pet," with several express exceptions. *Id.* § 1.1; *see also* 7 U.S.C. § 2132(g) (defining "animal" similarly as "any . . . warm-blooded animal, as the Secretary may determine is being used, or is intended for use, for research,

testing, experimentation, or exhibition purposes, or as a pet," with several express exceptions). The Judicial Officer concluded that Knapp, while operating as a "dealer," purchased or sold 235 regulated animals without a license, in violation of 7 U.S.C. § 2134 and 9 C.F.R. §§ 2.1(a) and 2.10(c). *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at *8. In his petition for review, Knapp argues that each of the challenged transactions is exempt from the licensing requirement for reasons discussed below.

## I. Purchase of Animals

■ Knapp argues that he purchased animals only for his own personal use, and not for resale, and that these purchases were exempt from the licensing requirement. Department regulations exempt from the licensing requirement "[a]ny person who buys animals solely for his or her own use or enjoyment and does not sell or exhibit animals, or is not otherwise required to obtain a license." 9 C.F.R. § 2.1(a)(3)(viii). However, at the time of the challenged transactions, a Department publication titled "Animal Care Resource Guide, Dealer Inspection Guide" ("Guide") stated: "The following activities are **exempt** from licensing requirements: *Acquisition or buying of an animal not for resale* does **not** require a license." The ALJ, relying on the regulation, found that none of Knapp's purchases required a license and that therefore none of these purchases violated the AWA or regulations. *In re Knapp*, AWA Docket No. 09–0175, 2011 WL 4946791, at *8. The Judicial Officer reversed the ALJ's conclusion, finding that Knapp was not exempt under the regulation because he sold animals, in addition to purchasing them. *In re*

**2.** Unless otherwise noted, the statutory and regulatory provisions cited have not been amended since the challenged transactions.

*Knapp,* AWA Docket No. 09–0175, 2013 WL 8213607, at *8.

 While the Guide could be read to exempt the act of purchasing for personal use, if the purchaser is selling only other animals, the regulation unambiguously applies the personal-use exemption only to "person[s]" who "do[ ] not sell or exhibit animals." 9 C.F.R. § 2.1(a)(3)(viii). No other regulatory or statutory provision contemplates the exemption Knapp infers from the double negative in the Guide, and the regulation states that all dealers who are not expressly exempt must obtain a license. *Id.* § 2.1(a)(1). Because the regulation is a legislative rule having the "force and effect of law," *see Perez v. Mortg. Bankers Ass'n,* — U.S. —, 135 S.Ct. 1199, 1203, 191 L.Ed.2d 186 (2015) (citation omitted), the Department may not adopt an inconsistent rule unless it proceeds through notice and comment. *See Clean Ocean Action v. York,* 57 F.3d 328, 333 (3d Cir.1995) ("An agency guideline or directive that conflicts with the plain meaning of a regulation is invalid."); *Mother Frances Hosp. of Tyler, Tex. v. Shalala,* 15 F.3d 423, 427 (5th Cir.1994) (holding that a policy articulated in an agency manual was invalid because it "impermissibly changed the meaning" of regulations promulgated through notice and comment), *cert. granted,* 514 U.S. 1011, 115 S.Ct. 1350, 131 L.Ed.2d 209 (1995), *vacated and remanded in light of Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 99–102, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995) (finding that the manual provision was valid because it did not conflict with the regulation, while noting that "APA rulemaking would still be required if [the manual] adopted a new position inconsistent with any of the Secretary's existing regulations"); *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan,* 979 F.2d 227, 234 (D.C.Cir.1992) (noting that an agency could not alter a regulation without notice and comment, "unless such a change can be legitimately characterized as merely a permissible interpretation of the regulation, consistent with its language and original purpose"). Because the Guide would be invalid to the extent that it could be read to conflict with the regulation, Knapp's actions are governed by the plain meaning of the regulation. As a person who sold animals, Knapp does not qualify for the exemption for persons who only purchase animals for personal use and do not also sell animals. 9 C.F.R. § 2.1(a)(3)(viii). We therefore find that the Judicial Officer's interpretation of the regulation is correct, even without the benefit of *Auer* deference.

 Knapp nevertheless argues that principles of fair notice preclude the Judicial Officer from penalizing him for conduct he perceives to be consistent with the Guide. We have held that the Secretary must "state with ascertainable certainty what is meant by the standards he has promulgated." *Diamond Roofing Co. v. Occupational Safety & Health Review Comm'n,* 528 F.2d 645, 649 (5th Cir.1976). "If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended but did not adequately express." *Id.; see also Gen. Elec. Co. v. U.S. EPA,* 53 F.3d 1324, 1329 (D.C.Cir.1995) ("If, by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform, then the agency has fairly notified a petitioner of the agency's interpretation." (internal quotation marks and citation omitted)). Consistent with these principles, the Supreme Court has declined to grant *Auer* deference where the agency's interpretation creates "unfair surprise" by "impos[ing] potentially massive liability on

[a party] for conduct that occurred well before that interpretation was announced." *Christopher,* 132 S.Ct. at 2167.

■■■ Knapp was not the victim of unfair surprise because the regulation, promulgated through notice and comment, clearly applies the purchase exemption only to persons who do not also sell animals. *See Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 170–71, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007) (finding that an interpretation codified through notice-and-comment rulemaking was "unlikely" to create "unfair surprise"); *Gen. Elec. Co.,* 53 F.3d at 1329 (asking "whether the regulated party received, or should have received, notice of the agency's interpretation in the most obvious way of all: by reading the regulations"); *cf. Christopher,* 132 S.Ct. at 2167 (refusing to defer to the agency's interpretation in part because "[t]he statute and regulations do not provide clear notice"). In addition, the relevant version of the Guide states that " '[i]t does not add to, delete from, or change current regulatory requirements or standards—nor does it establish policy.' " *In re Schmidt,* AWA Docket No. 05–0019, 2007 WL 959715, at *27 (U.S.D.A. Mar. 26, 2007) (alteration in original) (quoting Animal Care Resource Guide, Dealer Inspection Guide 1.2.1.). Given the regulation's plain language and the Guide's disclaimer, Knapp had fair notice of his exposure to civil penalties based on his purchases of regulated animals.

## II. Farm Animals

■■■ Knapp next argues that the Judicial Officer erred in declining to classify several of the animals at issue as "farm animals," which are not subject to the licensing requirement. The licensing requirement attaches to the purchase, sale, or transportation of "animal[s]" under certain circumstances. 7 U.S.C. § 2134. The term "animal" is defined, in relevant part, as:

> any ... warm-blooded animal, as the Secretary may determine is being used, or is intended for use, for research, testing, experimentation, or exhibition purposes, or as a pet; but such term excludes ... farm animals such as, but not limited to livestock or poultry, used or intended for use as food or fiber, or livestock or poultry used or intended for use for improving animal nutrition, breeding, management, or production efficiency, or for improving the quality of food or fiber.

*Id.* § 2132(g). Department regulations repeat the statutory definition of "animal," and further define "farm animal" as

> any domestic species of cattle, sheep, swine, goats, llamas, or horses, which are normally and have historically, been kept and raised on farms in the United States, and used or intended for use as food or fiber, or for improving animal nutrition, breeding, management, or production efficiency, or for improving the quality of food or fiber. This term also includes animals such as rabbits, mink, and chinchilla, when they are used solely for purposes of meat or fur, and animals such as horses and llamas when used solely as work and pack animals.

9 C.F.R. § 1.1. Pursuant to these definitions, the Judicial Officer dismissed the Administrator's charges against Knapp for purchasing or selling cattle, sheep, swine, goats, and llamas without a license. *In re Knapp,* AWA Docket No. 09–0175, 2013 WL 8213607, at *7. Although the Judicial Officer found the record unclear as to whether the species that Knapp purchased and sold were farm animals, he decided to "give Mr. Knapp the benefit of the doubt." *Id.* In his petition for review, Knapp argues that aoudad, alpaca, camels, and miniature donkeys are "farm animals," and

that the Judicial Officer therefore erred in concluding that Knapp's transactions involving these animals violated the AWA.

The ALJ found that camels are not farm animals, and Knapp did not challenge that determination in his brief to the Judicial Officer. *In re Knapp*, AWA Docket No. 09–0175, 2011 WL 4946791, at *5. Knapp therefore waived his argument regarding camels. *See Kollman Ramos v. U.S. Dep't of Agric.*, 322 Fed.Appx. 814, 819 (11th Cir.2009) (holding that the petitioner waived arguments that were not properly raised before the Judicial Officer); *McConnell v. U.S. Dep't of Agric.*, 198 Fed.Appx. 417, 424–25 (6th Cir.2006) (same); *Excel Corp. v. U.S. Dep't of Agric.*, 397 F.3d 1285, 1296–97 (10th Cir. 2005) (same). However, Knapp argued to the ALJ that aoudad, alpaca, and miniature donkeys are farm animals, and the ALJ agreed with respect to aoudad and alpaca. *In re Knapp*, AWA Docket No. 09–0175, 2011 WL 4946791, at *10. The ALJ found that aoudad "are goats which are considered farm animals and which exist in significant numbers on farms in the United States and are raised for both food, hunting, and breeding purposes." *Id.* The ALJ also found that an alpaca is a farm animal "which exists in significant numbers on farms in the United States and is raised for . . . wool, food, work and breeding purposes." *Id.* The ALJ did not discuss whether miniature donkeys are farm animals because he found that Knapp's purchase of these donkeys did not violate the AWA under the exemption he identified for purchases for personal use. *Id.* at *8. However, the ALJ noted that "[t]he definition of farm animals found in the Regulations contains no limiting language as to size (regular or miniature)." *Id.* at *6.

■■■■ The Judicial Officer did not discuss aoudad, alpaca, or miniature donkeys in the body of his opinion, but drew conclusions of law that Knapp's purchases or sales of twenty-one alpaca, two aoudad, and twenty-five miniature donkeys violated the AWA and regulations. *In re Knapp*, 2013 WL 8213607, at *15–17. We cannot reasonably discern the reason for the Judicial Officer's conclusion that aoudad, alpaca, and miniature donkeys are "animals" under the AWA and not farm animals. *See Pension Benefit Guar. Corp.*, 374 F.3d at 366; *see also* 5 U.S.C. § 557(c) ("All decisions . . . shall include a statement of . . . findings and conclusions, *and the reasons or basis therefor,* on all the material issues of fact, law, or discretion presented on the record . . . ." (emphasis added)). While the Judicial Officer may substitute his judgment for that of the ALJ, the absence of any explanation precludes us from exercising judicial review. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50, 103 S.Ct. 2856 ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").[3] The appropriate remedy here is remand for the agency to better explain its decision. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Norinsberg v. U.S. Dep't of Agric.*, 162 F.3d 1194, 1200 (D.C.Cir.1998)

---

**3.** To the extent that the Judicial Officer concluded that the list of farm animals in 9 C.F.R. § 1.1 is exhaustive, that conclusion appears to conflict with the AWA's characterization of certain "poultry" as farm animals.

7 U.S.C. § 2132(g). In addition, the Judicial Officer did not consider that an aoudad may be a type of goat, as the ALJ found, and thus would be included among the farm animals listed in 9 C.F.R. § 1.1.

("As we are unable to determine what, if any, standard the [Judicial Officer] applied, ... we must remand to Agriculture to articulate a standard we can review in an informed manner."); *Citizens State Bank of Marshfield, Mo. v. Fed. Deposit Ins. Corp.*, 718 F.2d 1440, 1444–45 (8th Cir.1983) (remanding to the agency to provide further explanation where the agency "failed to articulate sufficiently the reasons and basis for [its] order").

### III. Breeding Program

██ Knapp argues alternatively that "most of the animals he purchased were bought for·use in his breeding program," and that these purchases did not require a license. He bases this argument on the AWA's definition of "animal" which, as noted, excludes "farm animals, such as, but not limited to ... livestock or poultry used or intended for use for ... breeding." 7 U.S.C. § 2132(g). While an animal's use for breeding is relevant to the determination of whether that animal is a farm animal, there is no separate categorical exception for all animals purchased for breeding purposes. Knapp's argument therefore lacks merit.

### IV. Hoofstock Animals

██ Knapp argues that the Judicial Officer erred in holding that an exemption from the licensing requirement for "hoofstock," set forth in the Guide, is invalid. During the relevant time period, the Guide stated that "[a] license is **not** required for any person who sells ... 10 or fewer wild/exotic hoofstock in a 12–month period for regulated purposes." In March 2011, after the transactions at issue, the Guide was amended to remove that language. The ALJ accepted the pre–2011 exemption as a policy statement entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See In re Knapp*, AWA Docket No. 09–0175, 2011 WL 4946791, at *7. The Judicial Offi-

cer noted that "neither the Animal Welfare Act nor the Regulations contain a '10–hoofstock per year' exemption," and he therefore declined to recognize such an exemption. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at *7. However, the Judicial Officer assessed no fine for the sales of the twenty-one animals that the ALJ had classified as hoofstock because the Guide "unambiguously" provided for a hoofstock exemption at the time of Knapp's conduct. *Id.*

We agree with the Judicial Officer that the unambiguous hoofstock exemption is inconsistent with Department regulations. As noted above, a Department regulation requires dealers to have a valid license except under eight enumerated circumstances. 9 C.F.R. § 2.1(a)(1), (3). None of these exemptions covers the sale of hoofstock. *Id.* § 2.1(a)(3). At the very least, the Judicial Officer's conclusion is not "plainly erroneous or inconsistent with the regulation," and there is no reason to "suspect that [his] interpretation does not reflect the agency's fair and considered judgment on the matter in question." *See Auer*, 519 U.S. at 461–62, 117 S.Ct. 905 (internal quotation marks and citation omitted). That the Judicial Officer declined to assess a penalty for sales of hoofstock alleviates concerns about fair notice to Knapp. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 518, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (noting that where the FCC adopted a new policy in the course of an adjudication, "the agency's decision not to impose any forfeiture or other sanction precludes any argument that it is arbitrarily punishing parties without notice of the potential consequences of their action").

██ Knapp claims that in addition to relying on the Guide, he was told by a Department inspector that he did not need a license to deal in hoofstock. Knapp ap-

pears to be arguing that the agency is now estopped from denying the existence of a hoofstock exception. Our court has not decided whether equitable estoppel may lie against the government, but even if it does, "the burden that a petitioner must meet is very high." *Robertson–Dewar v. Holder*, 646 F.3d 226, 230 (5th Cir.2011). We have held that

> the party seeking estoppel must establish five things: (1) affirmative misconduct by the government, (2) that the government was aware of the relevant facts and (3) intended its act or omission to be acted upon, (4) that the party seeking estoppel had no knowledge of the relevant facts and (5) reasonably relied on the government's conduct and as a result of his reliance, suffered substantial injury.

*Id.* at 299. Knapp claims only affirmative misconduct—an "affirmative misrepresentation," *Linkous v. United States*, 142 F.3d 271, 278 (5th Cir.1998)—and does not analyze or demonstrate the remaining four factors. Knapp therefore fails to carry the heavy burden of showing that he is entitled to equitable estoppel.

In his reply brief, Knapp argues that fifty-seven of the animals he sold were hoofstock, and that the Judicial Officer therefore erred in counting twenty-one hoofstock. The Judicial Officer categorized as hoofstock the same animals that the ALJ had treated as hoofstock—six addax, seven buffalo, two zebras, three nilgai, one blackbuck, one wildebeest, and one deer. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at *7. Knapp does not identify which additional animals the Judicial Officer should have treated as hoofstock. He therefore waived his argument that the Judicial Officer under-calculated the number of hoofstock he sold.

*See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir.1994) (noting that a party waives a claim by failing to adequately brief it).

## V. Intended Purpose

 Knapp argues that his sales of animals to Lolli Brothers Livestock Market ("Lolli Brothers") did not violate the AWA or regulations because he did not know the purchaser's intended purpose.[4] Knapp relies on the Guide, which, at the relevant time, provided that a license is not required for "sales of animals through auctions where intended use is unknown." That provision is consistent with the AWA, which prohibits unlicensed dealers from selling animals to "another dealer or exhibitor" or "to any research facility or for exhibition or for use as a pet." 7 U.S.C. § 2134. The transaction's purpose is also relevant to the question of whether Knapp was operating as a "dealer," which is defined, *inter alia*, as a person who sells an animal "for research, teaching, exhibition, or use as a pet." *Id.* § 2132(f).

The Judicial Officer concluded that twelve animals sold to Lolli Brothers, in light of their "value" and "relative rarity," were "used, or intended to be used, for a regulated purpose," discernibly here, exhibition. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at *12. With respect to those twelve animals—a kinkajou, five guanacos, and six camels—the Judicial Officer has articulated a "rational connection between the facts found and the decision made," and his decision therefore withstands review. *Pension Benefit Guar. Corp.*, 374 F.3d at 366. However, the Judicial Officer did not discuss the likely intended use of the twenty-two additional animals that Knapp sold to Lolli Brothers—one alpaca, one aoudad, two zebras,

---

**4.** Although Knapp's petition for review raises this argument with respect to unnamed "auction houses," his brief to the Judicial Officer identifies Lolli Brothers as the relevant auction house.

one wildebeest, two addax, seven buffalo, three nilgai, four chinchilla, and one axis deer. The Judicial Officer summarily concluded that these sales were unlawful, notwithstanding Knapp's argument that sales of animals to Lolli Brothers did not require a license because the purchasers' intentions were unknown.[5] *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at \*16–18. The basis for the Judicial Officer's rejection of Knapp's argument with respect to these twenty-two animals cannot "reasonably be discerned," *Pension Benefit Guar. Corp.*, 374 F.3d at 367, and we may not supply our own basis for the Judicial Officer's decision. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). As with the Judicial Officer's decision on farm animals, the appropriate remedy is to remand to the agency for further explanation.

## VI. Individual Sales—Camel and Lemurs

■ Knapp challenges the Judicial Officer's finding, in agreement with the ALJ, that two specific transactions violated the AWA. First, Knapp challenges the Judicial Officer's finding that his sale of a camel to Kimberly Finley in November 2005 violated the AWA. Although Knapp admitted at the hearing that he sold the camel to Finley, he disputes the Judicial Officer's finding that Finley was an exhibitor who intended to use the camel for exhibition. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at \*6. Because Knapp did not have a license, the AWA prohibited him from "sell[ing]" an "animal" to an "exhibitor" or for the purpose of "exhibition" while operating as a "dealer." 7 U.S.C. § 2134. An "exhibitor" is defined as "any person … exhibiting any animals … to

the public for compensation," and "includes carnivals, circuses, and zoos." 7 U.S.C. § 2132(h).

The Judicial Officer based his determination on Finley's affidavit, which states that she is "an exhibitor of Exotic Animals" and that she "operate[s] a petting zoo, with pony and camel rides." *In re Knapp*, Docket No. 09–0175, 2013 WL 8213607, at \*6. The Judicial Officer further relied on record evidence that Finley's spouse, Herschel Finley, possessed an exhibitor's license, suggesting that he intended to exhibit the camel. *Id.* Indeed, even Knapp acknowledged in testimony that the camel "could still continue to do rides" after its sale to Finley.

■ On appeal, Knapp argues that Finley's affidavit does not adequately support the Judicial Officer's factual findings because the affidavit is hearsay and was contradicted by Knapp's own testimony. Hearsay is not categorically excluded from formal adjudicatory proceedings. *See* 5 U.S.C. § 556(d) ("Any oral or documentary evidence may be received. . . ."). We have held that "in determining whether hearsay can constitute substantial evidence [in an administrative proceeding,] we must look to those factors which assure underlying reliability and probative value." *Young v. U.S. Dep't of Agric.*, 53 F.3d 728, 730 (5th Cir.1995) (internal quotation marks and citations omitted). Knapp identifies no reason to doubt the veracity of Finley's sworn statements. While Knapp argues that Finley's statements are belied by his testimony that Finley was not a licensee, Finley could have purchased the camel for exhibition without a license, even though such a purchase may have been unlawful. In light of Finley's affidavit and her husband's exhibitor license, a "reasonable mind" could find that Finley purchased the

---

5. The Judicial Officer assessed no penalties for the sales of the buffalo, wildebeest, zebras, addax, nilgai, and axis deer, all of which he

categorized as hoofstock. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at \*7.

camel for exhibition, and that Knapp's sale was therefore unlawful. *See Ellis,* 394 F.3d at 273.

 Knapp further challenges the Judicial Officer's finding, in agreement with the ALJ, that he sold two lemurs to the Texas Zoo in violation of the AWA. *In re Knapp,* AWA Docket No. 09–0175, 2013 WL 8213607, at *6. Knapp argues that he donated the lemurs to the Texas Zoo and did not sell them. The difference is relevant because a "dealer" is one who transacts in regulated animals "for compensation or profit." 7 U.S.C. § 2132(f). The Judicial Officer appears to have found that Knapp received compensation in the form of two zebras. The following evidence supports that conclusion. A letter from the Executive Director of the Texas Zoo states that Knapp provided the lemurs and two macaws to the zoo in exchange for two zebras. On a Department form reflecting the transaction, the box for "exchange or transfer" was checked, and not the box for "donation."[6] Indeed, Knapp testified that he received two zebras from the Texas Zoo after he gave the zoo the two lemurs, although he claimed that the transaction was not an exchange. Considering the record as a whole, there is substantial evidence to support the Judicial Officer's finding that Knapp sold the lemurs in exchange for two zebras.

## VII. Calculation of Animals

Knapp challenges the Judicial Officer's calculation of 235 as the number of animals that Knapp bought or sold in violation of the AWA and regulations. We agree that the Judicial Officer made a small mathematical error, but the error actually benefitted Knapp. Based on the Judicial Officer's substantive findings, he should have calculated 236 violations and assessed pen-

alties for 215 of these violations. *In re Knapp,* AWA Docket No. 09–0175, 2013 WL 8213607, at *15–18. Instead, he calculated 235 violations and assessed penalties for 214 of these. *Id.* at *9. We therefore reject Knapp's argument that the Judicial Officer erred in over-calculating the number of violations.

## VIII. Size of Fine for Violations of Statute and Regulations

 Knapp challenges the Judicial Officer's imposition of a $42,800 penalty for operating as a dealer without a license. The Judicial Officer assessed a $200 penalty for each of 214 violations of the AWA and regulations, not counting the penalty for violations of the cease and desist orders. *Id.* at *10 & n. 22. As noted, we review the Judicial Officer's choice of sanction for abuse of discretion, *Am. Fruit Purveyors, Inc.,* 630 F.2d at 374, and we may overturn that sanction only if it is "unwarranted in law or without justification in fact." *Butz,* 411 U.S. at 186, 93 S.Ct. 1455. We will not review the total sanction imposed in light of our remand to the agency for further explanation of its decision regarding alpaca, aoudad, miniature donkeys, and twenty-two of the animals sold to Lolli Brothers. However, we may consider whether the Judicial Officer abused its discretion in imposing a penalty of $200 for each of the remaining transactions, given that we uphold the Judicial Officer's finding that these transactions were unlawful.

First, Knapp argues that the Judicial Officer impermissibly treated the statutory maximum penalty as mandatory. However, as we will explain, the penalty of $200 per violation is below the statutory maximum. Before June 18, 2008, the AWA authorized the Secretary to assess a civil

**6.** Although this form appears to be missing from the record on appeal, the form was received as evidence at the hearing, and Knapp acknowledged in testimony that the box labelled "exchange or transfer" was checked.

penalty of up to $2,500 for each violation of the AWA and regulations. 7 U.S.C. § 2149(b) (2005) ("Any dealer ... that violates any provision of this chapter, or any rule, regulation, or standard promulgated by the Secretary thereunder, may be assessed a civil penalty by the Secretary of not more than $2,500 for each such violation."). As of June 2005, before the first of Knapp's challenged transactions, the Secretary had increased that figure to $3,750 per violation under the Federal Civil Penalties Inflation Adjustment Act.[7] *See* 70 Fed.Reg. 29573, 29577 (May 24, 2005) (codified at 7 C.F.R. § 3.91(b)(2)(ii) (2006)). On June 18, 2008, Congress amended § 2149(b) to provide for a maximum civil penalty of $10,000 for each violation of the AWA and regulations. Pub.L. No. 110–246, § 14214, 122 Stat. 1651, 2228 (2008) (codified at 7 U.S.C. § 2149); *see also* 7 C.F.R. § 3.91(b)(2)(ii) (2015) (restating the $10,000 maximum penalty). The Judicial Officer correctly concluded that Knapp could be assessed a penalty of up to $3,750 for each of the 38 violations he committed before June 18, 2008, and a penalty of up to $10,000 for each of the 176 violations he committed after June 18, 2008, not counting the violations involving sales of hoofstock. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8208439, at *8 & n. 20. At all relevant times, therefore, the maximum penalty exceeded the imposed penalty of $200 per violation.

Second, Knapp argues that the Judicial Officer erred in concluding that he did not act in good faith. The AWA requires the Secretary, in selecting a penalty, to "give due consideration" to various factors, including "the person's good faith." 7 U.S.C. § 2149(b). The Judicial Officer concluded that Knapp lacked good faith because his conduct during a five-year period "reveal[ed] a consistent disregard for, and unwillingness to abide by, the requirements of the Animal Welfare Act and the Regulations." *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at *9. The Judicial Officer did not abuse his discretion in finding a lack of good faith, particularly in light of Knapp's previous violations of the AWA and regulations. *See In re Mitchell*, AWA Docket No. 09–0084, 2010 WL 5295429, at *7 (U.S.D.A. Dec. 21, 2010) ("Mr. Mitchell has a history of previous violations and this fact demonstrates an absence of good faith."); *see also Horton v. U.S. Dep't of Agric.*, 559 Fed.Appx. 527, 535 (6th Cir.2014) ("[B]ad faith ... can also be found where a petitioner receives notice of his violations yet continues to operate without a license."); *Cox v. U.S. Dep't of Agric.*, 925 F.2d 1102, 1107 (8th Cir.1991) (upholding the Judicial Officer's finding of a lack of good faith based on a previous AWA violation and a failure to learn facts that would have alerted petitioners to an additional AWA violation).[8]

---

**7.** The Federal Civil Penalties Inflation Adjustment Act of 1990 requires the heads of agencies, by regulation, to adjust civil monetary penalties every four years to reflect inflation. *See* Pub.L. No. 101–410, 104 Stat. 890 (codified at 28 U.S.C. § 2461 Note); *see also* Richard J. McKinney, Ass't Law Librarian, Fed. Res. Bd., The Authority of Statutes Placed in Section Notes of the United States Code (May 26, 2011).

**8.** The Judicial Officer separately found that Knapp's violations of the AWA and regulations were "willful." *In re Knapp*, AWA

Docket No. 09–0175, 2013 WL 8213607, at *11. However, neither the AWA nor the regulations require a showing of willfulness for the imposition of a civil monetary penalty. *See Horton*, 559 Fed.Appx. at 531 ("[T]he plain language of the statute lacks a willfulness requirement, and Petitioner clearly violated the AWA by conducting business without a license, regardless of willfulness or knowledge."); *Hickey v. Dep't of Agric.*, 878 F.2d 385, 1989 WL 71462, at *2 (9th Cir. June 26, 1989) (unpublished opinion) (noting that "7 U.S.C. § 2149(b) provides for penalties in the case of any violation, willful or not, with

Third, Knapp argues that the Judicial Officer erred in refusing to consider factors other than those listed in § 2149(b)— "the size of the business of the person involved, the gravity of the violation, the person's good faith, and the history of previous violations." Knapp's argument rests on a mistaken premise. The Judicial Officer did not consider only the factors identified in § 2149(b), but also noted the Department's sanction policy and the "remedial purposes" of the AWA. *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at *10. To the extent that Knapp challenges the Judicial Officer's refusal to consider his financial circumstances, the Judicial Officer did not abuse his discretion in that regard. Neither the statute nor the regulations require consideration of financial status, and the Judicial Officer's decision is consistent with Department precedent. *See In re Everhart*, 56 Agric. Dec. 1400, at *9 & n. 12 (U.S.D.A. Oct. 2, 1997) (listing cases).

▇▇▇ Finally, Knapp argues that the statutory section on penalties, titled "Violations by licensees," does not apply to him because he does not have a license. 7 U.S.C. § 2149(b). However, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Bhd. of R.R. Trainmen v. Balt. & O.R. Co.*, 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). The statutory text plainly applies to non-licensees who violate the AWA or regulations: sanctions may be imposed against *"[a]ny dealer ... that violates any provision of this chapter, or any rule, regulation, or standard promulgated by the Secretary thereunder."* 7 U.S.C. § 2149(b) (emphasis added). The chapter and corresponding regulations, in turn, generally prohibit dealers from buying and selling animals without a license.

Section 2149's penalty provisions therefore apply to Knapp, notwithstanding that section's title. Hence, the Judicial Officer did not abuse his discretion in assessing a $200 penalty for each violation that is not the subject of our remand.

## IX. Size of Fine for Violations of Cease and Desist Orders

▇▇▇ Knapp also challenges the Judicial Officer's imposition of a $353,100 penalty for knowingly disobeying two prior cease and desist orders. Again, while we will not review the total sanction, we will consider challenges to the Judicial Officer's decision to impose a penalty of $1,650 for each of the violations not involving aoudad, alpaca, miniature donkeys, or the unexamined sales to Lolli Brothers.

▇▇▇▇▇▇ First, Knapp challenges the Judicial Officer's legal conclusion that the statute requires a penalty of $1,650 for each knowing failure to obey the cease and desist orders. The AWA provides, "Any person who knowingly fails to obey a cease and desist order made by the Secretary under this section shall be subject to a civil penalty of $1,500 for each offense...." 7 U.S.C. § 2149(b). Before the transactions at issue, and pursuant to the mandate in the Federal Civil Penalties Inflation Adjustment Act, the Secretary adjusted that penalty to $1,650. *See* 70 Fed.Reg. 29573, 29577 (May 24, 2005) (codified at 7 C.F.R. § 3.91(b)(2)(ii)). Relying on the word "shall" in the AWA, the Judicial Officer concluded that the Act "leaves no room for discretion regarding the assessment of a civil penalty for a knowing failure to obey a cease and desist order." *In re Knapp*, AWA Docket No. 09–0175, 2013 WL 8213607, at *10. Because the Judicial Officer's interpretation of the AWA is entitled

'due consideration to ... the person's good faith, and the history of previous viola- tions' "(alteration in original)).

to *Chevron* deference, we consider, first, whether the statute is ambiguous, and, second, whether the Judicial Officer's interpretation is reasonable. *Chevron, U.S.A., Inc.*, 467 U.S. at 843, 104 S.Ct. 2778. The word "shall" in statutory language defining agency authority often contemplates permission, not obligation. *See, e.g., Heckler v. Chaney*, 470 U.S. 821, 835, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (finding precatory a statutory provision stating that violators "shall be imprisoned ... or fined," and listing other statutes that use "shall" to convey executive discretion). However, we do not focus on the word "shall" in isolation, but rather "follow the cardinal rule that statutory language must be read in context [since] a phrase gathers meaning from the words around it." *Hibbs v. Winn*, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (alteration in original) (internal quotation marks and citation omitted). The penalty provision regarding knowing violations of cease and desist orders may be contrasted with other language in the same statutory section, which provides that violators of the statute or regulations "*may* be assessed a civil penalty by the Secretary of not more than $10,000." 7 U.S.C. § 2149(b) (emphasis added). The contrast suggests a deliberate choice by Congress to make one penalty precatory and the other mandatory. *See Gozlon–Peretz v. United States*, 498 U.S. 395, 404, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (alteration in original) (internal quotation marks omitted)). The statute is at most silent on the question of whether Congress intended to allow executive discretion to impose lighter penalties for violations of cease and desist orders, and the Judicial Officer's contrary interpretation has ample basis to be reasonable. Indeed, that interpretation is consistent with Department regulations, which state: "Civil penalty for a violation of the Animal Welfare Act ... *has a maximum* of $10,000, and knowing failure to obey a cease and desist order *has* a civil penalty of $1,650." 7 C.F.R. § 3.91(b)(2)(ii) (emphasis added). We defer to the Secretary's reasonable interpretation of the AWA to require a penalty of $1,650 per violation, and we conclude that Knapp's challenge lacks merit.

■ Second, Knapp argues that the Judicial Officer committed "malfeasance" in imposing a total penalty of $395,900 in light of the Secretary's lower requested penalty.[9] The Secretary has held that "[t]he administrative recommendation as to the appropriate sanction is entitled to great weight, in view of the experience gained by the administrative officials during their day-to-day supervision of the regulated industry." *See In re S.S. Farms Linn Cnty., Inc.*, 50 Agric. Dec. 476, 497 (U.S.D.A.1991). However, that recommendation is not dispositive. *See id.* (noting that the recommendation should be given "appropriate weight"). The Judicial Officer's penalty follows necessarily from his interpretation of the statute, to which we defer.

■ Finally, Knapp challenges the Judicial Officer's factual finding that his violations of the cease and desist orders were "knowing." Knapp points to testimony by himself and his wife that they allegedly relied on misinformation from a lawyer in failing to pay the $5,000 fine im-

---

9. In its brief to the ALJ, the Administrator requested a penalty of $75,000 for Knapp's violations of the AWA and regulations and a penalty of $33,000 for Knapp's violations of the cease and desist orders.

posed after a previous violation of the AWA. However, the penalty at issue was not based on Knapp's failure to pay the fine, but rather on his continued violations of the AWA and regulations, which in turn violated the cease and desist orders. Elsewhere in his brief, Knapp argues that he reasonably relied on the Guide in determining that his conduct was lawful, thus suggesting an argument that his violations of the cease and desist orders could not have been knowing. However, it is a "deeply-rooted common law principle ... that ignorance of the law provides no defense to its violation." *United States v. Wilson,* 133 F.3d 251, 261 (4th Cir.1997). "This maxim is so strongly embedded in our legal system that 'unless the text of a statute *dictates* a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.'" *United States v. Ho,* 311 F.3d 589, 605 (5th Cir.2002) (quoting *Bryan v. United States,* 524 U.S. 184, 193, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998)); *see also United States v. Int'l Minerals & Chem. Corp.,* 402 U.S. 558, 559, 563, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (holding that the phrase "knowingly violates [applicable regulations]" required knowledge of the facts that constituted the violation, but not knowledge of the regulations); *Wilson,* 133 F.3d at 262 ("[W]e cannot conclude that Congress intended to require the defendant to know that his conduct was illegal when it stated that 'Any person who *knowingly* violates [provisions of the Clean Water Act] ... shall be punished.'"). Knapp does not identify, and we have not found, any language in the statute, regulations, or legislative history that displaces the well-established principle that ignorance of the law is no defense. The determination that Knapp's violations were "knowing" requires only that Knapp knew the facts that constituted the unlawful conduct. *See Ho,* 311 F.3d at 605. Substantial evidence in the record supports

that conclusion with respect to the transactions not subject to remand: Knapp knew the existence of the cease and desist order, and he knew he was purchasing and selling the animals at issue without a license. The Judicial Officer therefore did not err in concluding that these violations were "knowing."

## X. Selective Enforcement

▆ Knapp argues that he was the target of selective enforcement, in violation of the equal protection component of the Due Process Clause of the Fifth Amendment. *See United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996). He claims that "a multitude of people" engaged in activities similar to Knapp's conduct, but were not subject to enforcement proceedings. To successfully bring a selective enforcement claim, Knapp must show that the agency's enforcement "was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Allred's Produce,* 178 F.3d at 748 (quoting *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962)); *see also Bryan v. City of Madison,* 213 F.3d 267, 277 (5th Cir.2000) (holding that a selective enforcement claim requires the plaintiff to "prove that the government official's acts were motivated by improper considerations, such as race, religion, or the desire to prevent the exercise of a constitutional right"). Knapp has not alleged or demonstrated that the Administrator based her enforcement decisions on an arbitrary classification or an otherwise improper consideration. That not all violators are prosecuted does not alone establish a constitutional violation. *See Allred's Produce,* 178 F.3d at 748 ("[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation." (quoting *Oyler,* 368 U.S. at 456, 82 S.Ct.

501)). Knapp's selective enforcement claim therefore lacks merit.

## XI. Due Process

 Knapp argues that the Judicial Officer is biased in favor of the Department, and that the adjudication therefore violated the Due Process Clause of the Fifth Amendment.[10] "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980). However, an agency's "dual role[ ] of investigating and adjudicating disputes and complaints" does not alone demonstrate unconstitutional bias. *Baran v. Port of Beaumont Navigation Dist. of Jefferson Cnty. Tex.*, 57 F.3d 436, 446 (5th Cir.1995). Rather, "[a]dministrative officers are presumed objective and capable of judging a particular controversy fairly on the basis of its own circumstances." *Menard v. FAA*, 548 F.3d 353, 361 (5th Cir.2008) (alteration in original) (internal citations and quotation marks omitted). "[W]e have held that we will not infer bias when no evidence is presented to indicate that a hearing officer's mind was irrevocably closed." *Baran*, 57 F.3d at 446.

 As support for his allegation of bias, Knapp highlights the Judicial Officer's employment with the Department, his decision to impose a penalty far greater than did the ALJ, and his suggestion that the Administrator refer for criminal prosecution any future violation by Knapp. The Judicial Officer's employment relationship with the Department does not suffice to demonstrate bias. *See Baran*, 57 F.3d at 446. Nor may we infer that the Judicial Officer has prejudged the case based on the size of the penalty imposed or the suggestion of criminal prosecution. Both the penalty and criminal prosecution are authorized by statute, *see* 7 U.S.C. § 2149(d), and the Judicial Officer has previously recommended criminal prosecution for future violations of repeat infringers. *See In re Mitchell*, AWA Docket No. 09–0084, 2010 WL 5295429, at *15. Knapp therefore has not demonstrated a due process violation.

## CONCLUSION

While most of Knapp's contentions lack merit, we find that the Judicial Officer did not sufficiently explain his reasons for treating aoudad, alpaca, and miniature donkeys as "animals," and not "farm animals." Nor did he sufficiently explain his conclusion that twenty-two of the sales to Lolli Brothers had a regulated purpose. We therefore GRANT in part and DENY in part the petition for review and REMAND to the agency to set out more fully the facts and reasons bearing on these two decisions.

---

10. While Knapp also relies on the Fourteenth Amendment, we consider his claim in the context of the Fifth Amendment, which applies to the federal government. *See Marshall v. Jerrico, Inc.*, 446 U.S. 238, 241–42, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980).